IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**CHESTER MITCHELL,**

      **Plaintiff,**

**v.**                                      **No. CIV 03-61 RLP/LCS**

**MIKE BRISENO,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

### Introduction

THIS MATTER is before the Court on Defendant Mike Briseno's ("Briseno's") Motion for Summary Judgment, filed August 30, 2004. [Doc. No. 62.] Briseno seeks summary judgment on Plaintiff Chester Mitchell's ("Mitchell's") remaining claims[1] that his Fourth Amendment rights were violated by an unlawful entry and search of his residence [Count III] and by an unlawful arrest and interrogation [Count I]. After this Motion was fully briefed, a discovery dispute arose regarding Mitchell's intention to take the deposition of a confidential informant. Mitchell asserted that the confidential informant's testimony would support his position in opposition of the Motion for Summary Judgment. The Court permitted the deposition to proceed, and supplementation of the briefing [Doc. Nos. 78, 80, 81]. After careful consideration of the pleadings, attachments and

---

[1] The excessive force claim was dismissed previously [Doc. No. 58], and other parties, both plaintiffs and defendants also were dismissed in three different Orders [Doc. Nos. 39, 41, and 47.] Thus, this Motion seeks dismissal of the entire case, i.e., the two remaining claims that Mitchell has asserted against Briseno.

1

pertinent law, the Court concludes that the Briseno's Motion for Summary Judgment should be denied. The Court's reasoning follows.

## **Background**

This case involves a warrantless entry into Mitchell's residence in Farmington, New Mexico on October 4, 2000, that resulted in the police finding a small package of crack cocaine on the kitchen floor of the house two to three feet from where Mitchell was sitting. [Doc. No.63, Ex. A.] Mitchell, who was 77 at the time, owned the house and lived in it with his daughter and grandson. [Doc. No. 63.] Mitchell was arrested after the drugs were found and spent 24 hours in jail, but no charges were brought against him. [Id.] He now contends, as stated above, that his Fourth Amendment rights were violated.

Briseno was a certified Bloomfield law-enforcement officer assigned to the Region II Narcotics Task Force that was investigating illegal drug trafficking in the Four Corners area of New Mexico. On October 4th, Briseno entered Mitchell's residence and asserts that he had probable cause to believe that the individuals inside the house were participating in drug trafficking, that exigent circumstances justified the warrantless entry, and that it was necessary for officer safety to conduct a protective sweep of the house. The protective sweep did not reveal any illegal drugs. Mitchell then gave verbal consent to search his residence and signed a written consent for the search. It was at this time that a small amount of crack cocaine was found.

Briseno previously filed a motion for summary judgment on the grounds of qualified immunity which was denied. He now contends that new and additional information was obtained through discovery that supports a finding of qualified immunity and also that there are no genuine issues of material fact for trial with respect to the Fourth Amendment claims.

Mitchell argues that genuine issues of material fact do exist, based in part on the anticipated testimony of the confidential informant ("CI"). When this Motion was filed, Mitchell had the affidavit of his investigator who had interviewed the informant. However, there was no sworn testimony from the informant upon which Mitchell could rely until the informant's deposition was taken on November 19, 2004.

## Undisputed Material Facts

The following facts are taken from the parties' pleadings, attachments, and portions of the transcript of the CI's deposition. Dan Catron, who owns the bus station next to Mitchell's house, had observed suspicious activity around or at the Mitchell's house since the 1980's. He had seen several individuals and relatives of Mitchell, although not Plaintiff himself, engaging in "suspicious drug deals" in front of Mitchell's house. Specifically, Catron saw people park, go into the Mitchell house and come back a minute or two later "dozens of times." He did not identify or see actual drugs, but did see small packets or money being exchanged.

The day before drugs were seized at the Mitchell house, Catron told a sergeant at the Task Force that he had counted 60 times when there had been a drug deal in front of Mitchell's house before Catron stopped counting. Catron also said that he had seen Mitchell drive up to the house when there was drug trafficking going on in front of the house.

Mitchell's residence had been suspected of being a crack cocaine house since about 1983. Other members of the Task Force had heard of and/or personally observed activities they associated with drug trafficking occurring at or around the Mitchell house for a considerable time prior to October 4th. Specifically, police had seen people go in and out of Mitchell's house on numerous occasions.

Prior to October 4th, Mitchell had had conversations with police officer Vince Mitchell about alleged drug activities at Mitchell's house. Officer Mitchell was asked during his deposition how Chester Mitchell responded regarding these discussions about suspected drug activities around his house. Chester Mitchell told Officer Mitchell that "it was grandkids, his kids and grandkids." When asked if Chester Mitchell was aware of drug related activities occurring outside his house, Chester Mitchell told the officer that he (Chester Mitchell) had lost control of them. [Vince Mitchell Dep. at 26.]

Another officer testified that he had stopped by Mitchell's house on a number of occasions and told Mitchell about people possibly dealing drugs from Mitchell's residence. Mitchell told this officer that "he's trying to stop them from doing things. Talked about them drinking outside, playing their music loud." [Ronald Hooper Dep. at 15-16[2].] Mitchell admitted that he had heard rumors that Brandon Rascon[3] was selling drugs, but he was not sure if he heard this before or after October 4th. [Chester Mitchell Dep. at 89.]

The Task Force was instructed to investigate possible drug trafficking at the Mitchell residence several days before October 4th. State police officer Eric Burnham conducted surveillance on Mitchell's house on October 3rd. He saw a number of vehicles stop momentarily in front of the house, individuals in front of the house approach the vehicles, something exchange hands and the vehicles drive off. Burnham saw several people go into the house, stay for a few minutes and leave. Based on these observations, he believed drug trafficking was occurring both in the front yard and

---

[2]The CI testified that he had seen Mitchell out in the yard arguing with his children or grandchildren about dealing drugs but that the children/grandchildren ignored him.

[3]Brandon Rascon was a friend of Mitchell's grandchildren or children.

4

inside the house. Burnham also attempted an unsuccessful "cold buy" at the Mitchell house on October 3rd.

Agent Jason Waybourn resumed surveillance on the Mitchell house on October 4th. He saw a passenger exit his vehicle and speak to someone in the front yard of the Mitchell house, both men get into what appeared to be an abandoned vehicle in the front yard, and the passenger exit the vehicle, get back into his own car and the vehicle drive away. Waybourn believed an illegal drug purchase had occurred. Waybourn then contacted Briseno and another sheriff assigned to the Task Force, who followed the suspected buyer's vehicle. Police stopped the car based on the observation that the occupants were not wearing seat belts and then noticed what they thought to be powdery crack cocaine on the passenger's hand. Testing confirmed their suspicions, and the passenger was arrested.

According to Briseno, the passenger admitted to purchasing the cocaine from Brandon Rascon from in front of Mitchell's house. When deposed, the passenger ("CI") gave contradictory testimony as to whether he was in the yard or in the street by Mitchell's house on the day in question, and he raised the Fifth Amendment privilege as to whether he actually purchased drugs on that date from anyone. [CI Dep. at 56, 63.] It is undisputed that the CI agreed for leniency to return to the Mitchell residence to purchase more crack cocaine.

In his deposition, the CI testified that there were about seven to thirteen or fourteen people in front of the Mitchell house, both in and outside the yard, the first time he was there on October 4th. He had been to the Mitchell house more than a dozen times before October 4th, 2000, as often as once a week. He routinely saw a large number of young black males hanging out in front of the Mitchell house. [CI Dep. at 44.] During his first visit to the Mitchell house on October 4th, the CI

5

testified that he saw people getting out of cars and going into the Mitchell residence, and that he believed these people were buying drugs from inside the house. [CI Dep. at 46-47.] He testified that the Mitchell grandchildren were dealing drugs when the CI first visited the house on October 4th. The CI observed five or ten drug transactions during the five minutes he was in the vicinity of the Mitchell house. The people outside the house were dressed in "Crips" attire. [CI Dep. at 51.]

On October 4th, after being picked up by Briseno, the CI was taken to the police station where he was wired before returning to the Mitchell residence. The CI believed that about two hours elapsed between being picked up and returning to the house. [CI Dep. at 32-33.]

Prior to the attempted cocaine purchase by the CI, Briseno discussed with Ben Eastburn, an assistant DA, whether police could enter the Mitchell residence to secure it during the bust until a search warrant was obtained. According to Briseno, Eastburn told him that if the buy bust was completed, the police could secure the people in the immediate area and the residence until they could obtain a search warrant. [Briseno Dep., at pp. 33-34.] Briseno believed that the Eastburn was personally present when he made this statement. Eastburn, however, testified that he did not recall any conversation with Briseno about a search of Mitchell's residence that day but that he would "rely on Briseno's recollection." [Eastburn Dep., at p. 14, 15.]

The CI testified that when he returned to the Mitchell residence, he neither went into the yard nor the house. [CI Dep. at 34-36.] He remained in the street. [Id. at 69.] The street was probably around 20 feet from Mitchell's house.

When the bust signal was given by the CI, the police converged on the scene. Burnham observed a gold colored vehicle parked directly in front of the house and stated that "they were speaking to some people out in the yard of [Mitchell's house] through the [car] window." [Burnham

Dep., at pp. 23-24.] Burnham testified that he was dressed in clearly marked raid gear issued by the State Police and that he was "yelling at them to stop, police." The driver disobeyed and left the scene "very fast." Counsel for Defendant states that several individuals ignored the order and fled the scene on foot. [Doc. No. 63, Fact No. 12.] However, the pages cited do not directly support counsel's statement.[4] At most, Burnham testified that the reason he could not get the license plate number on the fleeing vehicle was because "there was a lot of people on foot, going every which way." [Burnham Dep., at p. 15.]

Defense counsel states that police officers were surprised by the number of people they encountered at the scene, that there were between 10 and 20 individuals in front of the Mitchell house, and that the police were outnumbered. [Doc. No. 63, Fact No. 13.] The cited deposition testimony reveals that one officer thought there were "ten [young men], I'm guessing" and that the police were outnumbered. [Burnham Dep., at pp. 38-39.] The other officer stated there were more than ten people there but "probably less than 20." [Waybourn Dep., pp. 27, 34.] He did not recall how many officers converged on the scene and did not know if there were more or less than five officers but he did testify that the police officers were outnumbered.[5] Neither officer testified that he was surprised by what he encountered. Although Briseno does not cite his own deposition testimony regarding the number of people present, he testified that his best estimate of the number of individuals on the sidewalk and in the Mitchell yard that day was "at least eight to ten." [Briseno Dep. at 33.]

---

[4]This is true with respect to a number of defense counsel's assertions. When the Court examined the cited portions of sworn testimony, that testimony did not clearly support the assertions in the brief. In other words, counsel's assertions were overstated when compared to the actual cited deposition testimony.

[5]Based on the attached deposition testimony, it appears that 7 to 9 officers were involved in the drug bust on October 4th: Briseno, Countryman, Waybourn, Hooper, Scott, Burnham, Vince Mitchell, Ledwitch and possibly Noon. At least one officer testified that they had their guns drawn, and it is undisputed that no weapons were observed or found at the Mitchell residence on October 4th or on any individual there that day.

According to defense counsel, the Task Force knew before the October 4th drug bust that Mitchell's grandchildren "were routinely hanging out in front of their grandfather's house." [Doc. No. 63, Fact No. 14.] The cited deposition of Briseno is that it was "pretty much common knowledge with the patrol officers on the street" that four of the grandchildren were gang members, but Briseno did not testify on this page that the grandchildren routinely hung out in front of the Mitchell house.

Police knew that some of Mitchell's grandchildren and their friends were members of the "Crips" gang, and police were aware of their gang affiliation prior to October 4th. Defense counsel also asserts that the police knew this gang to previously have engaged in violence and that there was "very heightened awareness" about this drug bust because of the "Crips" involvement. The cited deposition testimony of Shawn Scott is that during police briefing before the bust there was no specific information that any of the individuals in or at the house were armed. [Scott Dep. at 46.] Scott stated that they did discuss the possibility of weapons and that "this is a fairly violent group". He then referred to another residence where a Mitchell relative lived and where people had been stopped with guns or weapons on them. Scott was not aware of anyone in possession of a firearm who had been arrested at or near the Mitchell residence. Scott did not recall any specific individuals being present at the Mitchell house on October 4th who were "Crips" members. Rather, he explained that there was a general knowledge that some of the residents or people congregating at the Mitchell residence were members of a gang. [Scott Dep. at 48.] Scott stated that as far as "the gang usage," this area of Farmington had been a dangerous area.

When the drug bust occurred, the front and back doors to the house were open. The screen doors were closed. Briseno observed smoke coming from the home's fireplace which he found

unusual given the time of year (October) and the outside temperature. After entering the house, police noted a wood burning stove that was burning hot.[6] One officer observed tin foil and pieces of plastic in the fireplace. When the drug bust occurred, Waybourn saw several people go into the Mitchell house but he did not know who entered the house. Briseno knew that at least four gang members were present at the residence on October 4th, and he knew of their gang affiliation prior to October 4th. However, when asked if he knew these four individuals had been identified as being present at Mitchell's house on October 4th, Briseno testified "No. I knew they hung out there." [Briseno Dep. at 51-52.] Defense counsel asserts that Mitchell's grandchildrens' involvement with gangs was documented in the Farmington Police Department's official gang book. [Doc. No. 63, Fact No. 24.] However, Briseno testified that while the Farmington Police Department keeps a "gang book," he did not know if any of the four individuals were identified as gang members in the book before October 4th. [Briseno Dep. at 52.] Defense counsel also relies on Briseno for the assertion that a number of individuals in front of the Mitchell house were dressed in clothing associated with the "Crips", and yet the page number cited makes no reference to gang clothing. [Doc. No. 63, Fact No. 24, Briseno Dep. at 39.]

The alleged drug bust occurred outside the house on October 4th. [Briseno Dep. at 36.] According to Briseno, the CI was given a rock of crack cocaine by an unknown Mexican or Mexican national who then fled the scene. No money was exchanged, but the CI gave the drug bust signal. [Briseno Dep. at 48-49.] At his deposition, the CI raised his Fifth Amendment privilege when asked

---

[6]Mitchell attempts to dispute this fact and refers to a page of his deposition testimony, but it was not attached.

if he was given a rock of crack cocaine on the second visit to the Mitchell house or vicinity. The CI observed one individual flee from the area outside the Mitchell residence.

The distance from the sidewalk to the front porch of Mitchell's house is about the length of a car. At least one individual who was inside the house heard the police outside the house. Once the police entered the Mitchell house, they found five individuals inside, including Mitchell who was in the kitchen with Sharon Mitchell.

Briseno and other officers conducted a brief protective sweep inside the house to see if anyone else was present and/or if anyone was destroying evidence. During the sweep, the police located no other people, no weapons and no drugs or drug paraphernalia. Mitchell then gave permission to the police to search his entire house and executed a written consent as well. A small amount of crack cocaine was found in the kitchen on the floor in the vicinity of Sharon Mitchell and Mitchell. Mitchell denied it was his cocaine. Mitchell was arrested because he owned the house where drugs were found.

The Court recognizes that in his opposition brief Mitchell failed to address or dispute Briseno's asserted undisputed fact numbers 25-39. Briseno, therefore, asserts that these facts are deemed admitted in accordance with LR-Civ 56.1(b) and that these admissions further support his summary judgment position. However, the Tenth Circuit explained that the nonmovant's burden to respond arises only where the summary judgment motion is properly "supported." Reed v. Bennett, 312 F.3d 1190, 1194 (10th Cir. 2002).

> Accordingly, summary judgment is 'appropriate' under Rule 56(e) only when the moving party has met its initial burden of production under Rule 56(c). If the evidence produced in support of the summary judgment motion does not meet this burden, ' summary judgment must be denied, *even if no opposing evidentiary matter is presented.*

Id. (emphasis in original) (internal citation omitted). In other words, whether the nonmovant properly responds or not, the Court still must decide if Defendant met its initial burden of demonstrating that no material issues of fact remain for trial. Id. For this reason, the Court has carefully examined Briseno's stated undisputed facts, even though Mitchell did not always dispute those facts.

## Analysis

### I.   WARRANTLESS ENTRY AND SEARCH [COUNT III]

The issue focuses on what facts were known to Briseno when he entered Mitchell's house without a warrant on October 4, 2000 that would support his belief that he could enter the house for officer safety and/or to prevent the destruction of evidence. In other words, what undisputed facts demonstrate exigent circumstances to justify Briseno's warrantless entry. The Court observes that the facts outlined above demonstrate that the police and neighbors of Mitchell believed that Mitchell's house was a crack house and that there had been drug trafficking in or around the house for as long as 20 years. However, the inquiry here is narrowed to what information Briseno had or was given before he entered the house on October 4, 2000.

#### A.   Exigent Circumstances

The Tenth Circuit has set out the following well-established principles with respect to warrantless entries and searches of a home.

> "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980). "[T]he Fourth Amendment has drawn a firm line at the entrance to the house." Id. at 590. "[A]bsent consent or exigent circumstances, police may not enter a citizen's residence without a warrant." United States v. Scroger, 98 F.3d 1256, 1259 (10th Cir. 1997). "The government bears the burden of establishing exigency. In [the Court's] assessment of whether the burden is satisfied, we are guided

11

>by the realities of the situation presented by the record.  We should evaluate the circumstances as they would have appeared to prudent, cautious and trained officers." United States v. Rhiger, 315 F.3d 1283, 1288 (10th Cir. 2003).

United States v. Carter, 360 F.3d 1235, 1241 (10th Cir. 2004).  The inquiry encompasses an objective standard, i.e., the facts are objectively evaluated as to what a prudent, cautious and trained officer knew.

Exigent circumstances may be established when officers have reason to believe that criminal evidence may be destroyed or removed before a warrant can be obtained.  Id.  There are four requirements before a permissible warrantless entry will be found under these circumstances:  "(1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of evidence is likely, (3) limited in scope to the minimum intrusion necessary, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse."  Id. (internal citation omitted).

The exigent circumstance test is not absolute as the determination ultimately depends upon the unique facts of each controversy.  Rhiger, 315 F.3d at 1288 (internal citation omitted), *cert. denied,* 540 U.S. 836 (2003).  For example, the test has also been articulated in the following manner: "(1) law enforcement officers must have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others, (2) the search must not be motivated by an intent to arrest and seize evidence, and (3) there must be some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched."  Id. (internal citation omitted).

### 1.  *Whether Briseno had an objective reason to believe that evidence would be destroyed before he could obtain a search warrant*

Here, Briseno knew that there were complaints about Mitchell's house and/or relatives being involved in the sale of drugs and that a narcotics task force was set up to investigate these complaints. Prior to October 4th, Briseno was aware that there was excessive foot and vehicle traffic around the Mitchell home. Briseno knew from another officer who conducted surveillance at the Mitchell house on October 4th, that there was vehicle traffic at the residence and that cars would drive up and then leave shortly thereafter, which could be an indicator of drug trafficking.

Briseno was informed by the surveillance team that a white Dodge vehicle pulled up to the residence on October 4th, a passenger exited and got into an inoperable vehicle parked in the front yard of the Mitchell residence, and then left within a short period of time. The surveillance officer conveyed to Briseno that the officer believed he had witnessed a drug transaction.

Briseno stopped the vehicle in question and the passenger was found to have crack cocaine. Briseno learned from the CI (although the CI now disputes this) that the CI had purchased the cocaine from Rascon "in front of the [Mitchell] residence." Briseno prepared the CI to attempt to make a buy at the Mitchell residence, and over two hours later the CI returned to the area of the Mitchell residence. [Briseno Aff. at ¶ 10.]

Briseno observed smoke coming from the Mitchell residence after he arrived on October 4th, which he found unusual for the time of year and outdoor temperature. Briseno had been advised that a number of people were entering and exiting the residence prior to the bust. He saw a number of young men outside the house, and he knew that some of the people who typically were seen outside

the Mitchell residence were gang members.  Before entering the house, Briseno would have assumed a drug transaction occurred somewhere outside the house since the CI gave the bust signal.

Based on these facts, the Court concludes that Briseno fails to satisfy his burden in demonstrating a reasonable belief that there would be drugs in the house that might be destroyed before a search warrant could be obtained.  No evidence was presented to support Briseno's reasonable belief that drugs would be found inside the Mitchell residence.  None of the officers reported that they had seen drugs being exchanged in the house or at the door of the house on that day.  None of the officers advised Briseno that Mitchell's family members had engaged in a drug deal on October 4th.  Instead, Briseno was informed that a non-family member, Rascon, was accused of drug trafficking that day.

Although Briseno knew there was a lot of foot and vehicle traffic into and out of the Mitchell residence, he essentially had this information for years before October 4th.  When Briseno made the warrantless entry, he had seen a number of individuals outside the house and a fleeing car, yet the police had observed people outside the house earlier that afternoon and on many occasions before October 4th.  In addition, the CI presented undisputed testimony that he saw five or ten drug transactions occurring the first time that he was outside the Mitchell house on October 4th.  The CI was being observed by police at the time.  It follows that the officers on surveillance also would have seen, at a minimum, suspicious activity around the house.  Yet, between the time the CI was picked up and then returned to the Mitchell house, at least two hours passed.  This two-hour window would have allowed the police to obtain a search warrant before entering the residence and also tends to undermine Briseno's contention that there were exigent circumstances when he did finally enter the house.  If officers had probable cause and failed to obtain a warrant when there was time to obtain

14

one, then exigent circumstances generally are not shown. United States v. Mabry, 809 F.2d 671, 678 (10th Cir.), *cert. denied,* 484 U.S. 874 (1987), *rev'd on other grounds*, 485 U.S. 58 (1988).

Based on these facts, the Court concludes that there are genuine issues of material fact as to whether there were "clearly defined indicators of exigency" in this case. In addition, the Court finds there are genuine issues of material fact as to whether destruction of evidence in the house was likely. Other than chimney smoke (in October), Briseno had no specific knowledge or reason to believe that there were drugs inside the house that might be destroyed. A fire in the fireplace in October is not compelling evidence of exigency. Moreover, Briseno did not know who was in the house or how many people were in the house.

### 2. *Whether Briseno had reasonable grounds to believe there was an immediate need to for officer safety to justify a warrantless entry and protective sweep*

Briseno contends that he had the right to enter the Mitchell house without a warrant and secure it from threats (by way of a protective sweep) for purposes of officer safety. An exception to the warrant requirement is the protective sweep "which is a 'quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.'" Maryland v. Buie, 494 U.S. 325, 327 (1990). The protective sweep must be justified by a reasonable perception, based upon specific and articulable facts, that the area swept harbors an individual posing an immediate danger to the officers or others. Id.

The facts supporting Briseno's position include his observation of a number of people outside the house, information that people had been going in and outside the house, knowledge that Mitchell's relatives were gang members, his belief that the police were outnumbered, knowledge of

complaints about Mitchell's house and drug trafficking for many years, and the inherent danger of drug trafficking.

Again, the Court concludes that genuine issues of material fact remain as to whether these factors constitute reasonable grounds for Briseno's belief that emergency conditions existed on that day or that the "area swept harbors an individual posing an immediate danger to the officers." None of the individuals seen at or around the house had weapons. Neither Briseno nor any officer testified that he heard threats being made by individuals around the house. It is not clear how outnumbered the police were, particularly in view of the fact that a number of police were present and entered with guns drawn, and none of the individuals at the Mitchell house had weapons.

The Court concludes that a genuine issue for trial remains as to the objective reasonableness of Briseno's belief that the warrantless entry and sweep were necessary for officer safety. Therefore, Count III (warrantless entry and search) will proceed to trial.

## II.     ARREST AND INTERROGATION OF MITCHELL [COUNT I]

Mitchell did not respond to Briseno's argument that the claim of alleged unlawful arrest and interrogation should be dismissed. It is undisputed that Mitchell was the owner of the home and that drugs were found in the home in the vicinity where Mitchell was sitting. However, "[w]hen a consensual search is preceded by a Fourth Amendment violation, . . . the government must prove not only [1] the voluntariness of the consent under the totality of the circumstances, but the government must also establish [2] a break in the causal connection between the illegality and the evidence thereby obtained." United States v. Melendez-Garcia, 28 F.3d 1046, 1053 (10th Cir. 1994) (internal citations omitted).

16

Here, the Court has not determined there was a Fourth Amendment violation, but rather that there is a genuine issue of material fact as to that question. Therefore, the government must prove, at a minimum, that there are no genuine issues of material fact as to a break in the causal connection between the entry and the evidence thereby obtained. The government has presented no such evidence. Accordingly, this claim [Count I] also survives the summary judgment motion and will proceed to trial.

### III.     QUALIFIED IMMUNITY

Briseno asks the Court to re-visit the issue of qualified immunity. As explained above, the Court has determined there are genuine issues of material fact in dispute as to whether exigent circumstances existed to support the warrantless entry, protective sweep and arrest/interrogation. In view of its above-stated determinations, the Court concludes that there are genuine issues of material fact as to whether Briseno held a good-faith objectively reasonable belief that he was not violating a clearly established constitutional right in entering the Mitchell residence without a warrant and conducting a sweep under these circumstances.

The Court rejects Briseno's additional argument that he is entitled to rely on assistant district attorney Eastburn's supposed advise that Briseno could conduct a protective sweep of Mitchell's house, etc. on the day in question. Eastburn himself did not remember a discussion of this nature with Briseno, even though Eastburn testified in his deposition that he had known Mitchell for years. Therefore, at a minimum, there is a genuine issue in dispute as to whether the conversation between Briseno and Eastburn occurred. The Court again denies the request for summary judgment based on qualified immunity.

IT IS THEREFORE ORDERED that Defendant Mike Briseno's Motion for Summary Judgment [Doc. No. 62] is DENIED.

                                                                      Richard L. Puglisi
                                            United States Magistrate Judge
                                                    (sitting by designation)